# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **CKH FAMILY LIMITED PARTNERSHIP,** *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> **HOLT HOMES, INC.,** *et al.*, <br><br> Defendants. | Case No. 3:17-cv-441-SI <br><br> **OPINION AND ORDER** |

Leslie S. Johnson and Darlene D. Pasieczny, SAMUELS YOELIN KANTOR LLP, 111 SW Fifth Avenue, Suite 3800, Portland, OR 97204. Of Attorneys for Plaintiffs.

Bradley W. Andersen and Phillip J. Haberthur, LANDERHOLM, PS, 805 Broadway Street, Suite 1000, Vancouver, WA 98660. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

In 2005, Plaintiffs Waldemar Maya, Van Shaw, and CKH Family Limited Partnership invested a total of $1.4 million in a real estate development plan orchestrated by Defendant Greg Kubicek. Plaintiffs are now suing Kubicek and three entities associated with Kubicek for: (1) rescission under Oregon Revised Statutes ("ORS") § 59.115(2); (2) misrepresentation; (3) breach of fiduciary duty by self-dealing; and (4) aiding and abetting an unlawful sale of securities in violation of ORS § 59.115(3). Before the Court are the parties' cross-motions for summary

judgment. For the reasons discussed, Defendants' motion for summary judgment is granted, and Plaintiffs' motion for summary judgment is denied as moot.

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

When parties file cross-motions for summary judgment, the court "evaluate[s] each motion separately, giving the non-moving party in each instance the benefit of all reasonable inferences." *A.C.L.U. of Nev. v. City of Las Vegas*, 466 F.3d 784, 790-91 (9th Cir. 2006) (quotation marks and citation omitted); *see also Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 674 (9th Cir. 2010) ("Cross-motions for summary judgment are evaluated separately under [the] same standard."). In evaluating the motions, "the court must consider each party's evidence, regardless under which motion the evidence is offered." *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011). "Where the non-moving party bears the burden of

PAGE 2 – OPINION AND ORDER

proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). Thereafter, the non-moving party bears the burden of designating "specific facts demonstrating the existence of genuine issues for trial." *Id.* "This burden is not a light one." *Id.* The Supreme Court has directed that in such a situation, the non-moving party must do more than raise a "metaphysical doubt" as to the material facts at issue. *Matsushita*, 475 U.S. at 586.

## BACKGROUND

Plaintiffs are CKH Family Limited Partnership ("CKH"), a Texas limited partnership, and two individuals: Waldemar Maya and Van Shaw. Shaw is an attorney in Texas. Maya is a business associate of Doug Hickok, who is the general partner and principal of CKH. Defendants are Holt Homes, Inc. ("Holt Homes"), a Washington Corporation; Clackamas Homes, Inc. ("CHI"), an Oregon Corporation; MGD/CCP Acquisition LLC ("the Company"), an Oregon limited liability company; and Greg Kubicek. ECF 1-1 at 39, ECF 5 at 2. CHI is the manager of the Company, and Holt Homes is an affiliate of CHI. ECF 1-1 at 39 ¶ 4, ECF 5 at 2 ¶ 4. Kubicek is the sole shareholder of both CHI and Holt Homes. ECF 5 at 2 ¶ 5.

### 1. Formation of the Company and Plaintiffs' Investments

Kubicek formed the Company in August 2005 for the purpose of acquiring a portfolio of properties in Clackamas County, Oregon from retiring developers Don and Maria Oakley. ECF 1-1 at 39 ¶ 2, ECF 5 at 2 ¶ 2. The properties at issue were held by two of the Oakleys' limited liability companies—MGD Properties, LLC ("MGD") and Cascade Community Properties, LLC ("CCP"). ECF 15 at 2 ¶ 3.

Kubicek planned to develop the properties and presented Plaintiffs with the opportunity to invest in the development. Kubicek detailed his prior development experience to the prospective investors. Kubicek also issued a Private Placement Memorandum ("PPM"), which

PAGE 3 – OPINION AND ORDER

described plans for the acquisition and development of the properties. ECF 5 at 3, ¶ 8; ECF 15 at 2-3, ¶ 7. Between late September and early October, 2005, Plaintiffs collectively invested $1.4 million in the Company. CKH invested $750,000, Maya invested $150,000, and Shaw invested $500,000. Each of the Plaintiffs signed a Subscription Agreement, agreeing to the terms and conditions of an Operating Agreement that would govern the operation of the Company. ECF 15-5; ECF 17 (Operating Agreement). After Kubicek formed the Company, the Company acquired 99 percent of MGD and CCP. ECF 15 at 2 ¶ 6. CHI, of which Kubicek was the sole owner, and which Kubicek formed to manage the Company, owned the remaining one percent of MGD and CCP. *Id.*

### 2. The Holt Homes Acquisition Loan

The Company acquired the properties on or about October 3, 2005. ECF 17 at 254. Shortly before the acquisition, the Company had collected just under $6 million in outside investment. ECF 17 at 156. According to Defendants, Kubicek had reason to believe, based on promises from investors, that the Company would raise $9,500,000, which Kubicek had represented was needed. ECF 15 at 4.

To close the deal, Holt Homes loaned the Company $3,606,984.40 ("the Holt Homes loan"). ECF 15 at 4. According to Defendants, this loan was intended to bridge the gap between the money already invested (just under $6 million) and money that had been committed but not yet delivered (approximately $9.5 million). *Id.* According to Defendants, after investors contributed their committed funds, the Company repaid Holt Homes from those funds. Holt Homes did not charge interest on this loan. Payments to Holt Homes were made between November 16, 2005 and December 23, 2005. By this point, the balance owed on the Holt Homes loan was reduced to $406,984. ECF 15 at 4. The Holt Homes loan was completely repaid by 2006. ECF 17 at 190.

PAGE 4 – OPINION AND ORDER

### 3. Development Progress

The Company ultimately sold ten of the individual property developments between October 2005 and 2014. ECF 15 at 5, ¶ 18. In 2006, the Company made one capital distribution, in the amount of ten percent, to the investors. ECF 5 at 4, ¶ 15. The Company did not, however, achieve the success that Kubicek or the investors had hoped. ECF 5 at 4, ¶ 15. Defendants blame this on the economic recession of 2007. ECF 15 at 5, ¶ 18. According to Kubicek, after the start of the recession the Company completed and sold as many lots and homes as it could, and held on to other assets and options to purchase other properties in the hope that the Company could weather the storm. ECF 15 at 5, ¶ 19.

Between 2003 and 2015, the Company issued 17 or 18 "member updates." ECF 15-9. The first report made to investors came in February 2006. The update contained a balance sheet that listed, as a line item, $406,984 owed to Holt Homes. *Id*. at 6, 8. It also indicated that Holt Homes had previously been owed $1,506,984, and had been paid $1,100,000 in the period ending December 31, 2005. According to Plaintiffs, Hickok made several attempts, over the course of twelve years, to obtain more detailed financial information from the Company. ECF 18 at 2, ¶ 4. At one point, Krista Harvill-Sorter, the chief financial officer for the Holt Group, sent Mr. Hickok several internal financial statements. *Id.*

On June 21, 2010, Kubicek issued a capital call seeking additional investor funds. Hickok traveled to Oregon to tour the properties and meet with Kubicek. ECF 18 at 3, ¶ 5. Hickok asked Kubicek to send additional documents, but Hickok never received those documents. ECF 18 at 3, ¶ 5. After Hickok's visit, Plaintiffs decided not to respond to the capital call. Since its formation, the Company has reported at least $23 million in revenue from sales of the acquired properties. Of that, $800,000 has been paid to outside investors—all of which was in the single 2006 distribution. ECF 5 at 4, ¶ 15-16.

### 4. Litigation and Communication History Between the Parties

On January 18, 2011, Shaw sued the Company and Kubicek in Dallas County, Texas on behalf of his then-clients, CKH and Maya ("the Texas lawsuit"). ECF 14-4. The Texas lawsuit alleged intentional misrepresentation, fraud, breach of fiduciary duty, and conspiracy, all in connection with the Plaintiffs' investments in the Company. *Id*. The Company entered a special appearance, arguing that Texas was an improper venue, because the Operating Agreements required that any lawsuit be filed in Oregon and that any dispute was subject to mandatory arbitration. ECF 15 at 6 ¶ 21; *CKH Family Ltd. P'ship v. MGD/CCP Acquisition, LLC*, 2013 WL 5614304, at *1 (Tex. App. Oct. 14, 2013).

In March, the plaintiffs in the Texas lawsuit sought discovery, including documents, answers to interrogatories, and depositions. ECF 22 at 20. Defendants moved to quash Plaintiffs' deposition notices in the Texas lawsuit. ECF 22 at 20-25. Defendants argued that discovery requested before a special appearance hearing was proper only as to jurisdictional facts and that the Plaintiffs' deposition notice exceeded that scope. ECF 22 at 21-22. The court granted the Defendants' request and quashed the deposition notice, allowing discovery only with regard to jurisdictional issues.

On June 6, 2011, after the Texas lawsuit had been filed, Hickok wrote to Kubicek, referencing an earlier discussion between the two parties about the litigation. Hickok requested various documents relating to the Company. ECF 15-6 at 9-10. In June 2011, the Company produced certain documents in discovery, including all tax returns dating back to 2005 and balance and income statements for the Company. ECF 15 at 6, ¶ 21. Plaintiffs filed a Second Amended Petition on September 2, 2011. ECF 14-5. The Company produced more documents on February 10, 2012. ECF 15 at 6, ¶ 21.

On February 13, 2012, the Texas court dismissed the case based on improper venue. ECF 14 at 2, ¶ 6. The Texas Court of Appeals affirmed on October 14, 2013, and issued its mandate on December 31, 2013. *Id*.; *CKH Family Ltd. P'ship v. MGD/CCP Acquisition, LLC*, 2013 WL 5614304, at *1 (Tex. App. Oct. 14, 2013).

One year later, in February 2013, Shaw, Hickok, and Maya hired Seattle lawyer Aaron Bigby to represent them. On March 6, 2014, more than a year later, Bigby wrote to Kubicek requesting records. Bigby also wrote to the Company's attorney, Michael Bortz, in late March, 2014 requesting records. ECF 14-7 at 2-3. Defendants responded by providing Plaintiffs with some requested records. Among the records provided was a "paid invoice register" that listed repayments the Company had made to Holt Homes for the amount used to purchase MGD and CCP. ECF 29-3 at 18. Also among the produced records was a document titled "MGD/CCP Acquisition Loans," which did not list the Holt Homes loan. ECF 17 at 201.

By March 2015, still another year later, Plaintiffs had retained attorney Leslie Johnson to replace Bigby. *See* ECF 14-8. Johnson spoke with Bortz by phone in late March. Johnson followed up that conversation with a letter dated April 22, 2015. *Id*. Johnson noted that she had "spent some time with the material [Defendants] assembled in the spring of 2014." *Id.* Johnson then requested that Bortz provide more documents related to the investment. *Id.* According to Plaintiffs, this request led to the production of more detailed disclosures in June 2015.

On January 21, 2016, Johnson proposed a tolling agreement to allow the parties to mediate their dispute. ECF 22 at 9-10. The Company declined the tolling agreement. On September 16, 2016, Plaintiffs filed the present action in Clackamas County Circuit Court against Holt Homes. Plaintiffs concurrently initiated arbitration pursuant to the Operating Agreement. The parties waived arbitration. Defendants then removed the case to this Court.

ECF 14 at 3 ¶¶ 10-11. Defendants move for summary judgment on the grounds that Plaintiffs' claims are untimely, and that Plaintiffs have not created a genuine dispute of fact on whether Defendants committed fraud. Plaintiffs cross-move for summary judgment on each of their claims against Defendants.

## DISCUSSION

For the reasons discussed below, the Court concludes that Plaintiffs' claims are time-barred. Thus, the Court does not reach Defendants' alternate ground for summary judgment, or Plaintiffs' motion for summary judgment.

### A. Standards

The parties do not dispute that each of Plaintiffs' claims is subject to a two-year statute of limitations. *See* ORS §§ 59.115; 12.110(1). The parties dispute, however, when the statute of limitations for Plaintiffs' claims began to run. The Oregon Supreme Court has held:

> The statute of limitations begins to run when the plaintiff knows or in the exercise of reasonable care should have known facts which would make a reasonable person aware of a substantial possibility that each of the three elements [of a claim] (harm, causation, and tortious conduct) exists.

*Gaston v. Parsons*, 318 Or. 247, 256 (1994). For the statute of limitations to begin to run, "the plaintiff does not need to know to certainty that each particular element exists"—"actual knowledge . . . is not required." *Id.* at 255-56. On the other hand, "a mere suspicion is insufficient to begin the statute of limitations to run." *Id.* at 256. "For purposes of determining what facts a plaintiff knows or should have known, 'the discovery rule applies an objective standard—how a reasonable person of ordinary prudence would have acted in the same or a similar situation.'" *Padrick v. Lyons*, 277 Or. App. 455, 466 (2016) (quoting *Kaseberg v. Davis Wright Tremaine, LLP*, 351 Or. 270, 278 (2011)). Plaintiffs must "act diligently to discover the relevant facts." *Id*.

PAGE 8 – OPINION AND ORDER

"[S]tatutes of limitations begin to run only when a plaintiff knows the facts necessary 'to support his right to judgment.'" *Keller v. Armstrong World Indus., Inc.*, 197 Or. App. 450, 463, *opinion adhered to as modified on reconsideration*, 200 Or. App. 406 (2005), and *aff'd*, 342 Or. 23 (2006) (citing *Stevens v. Bispham,* 316 Or. 221, 227 (1993)). This connotes "a high degree of certainty" on a plaintiff's part. "The discovery rule does not," however, "protect those who sleep on their rights, but only those who, in exercising the diligence expected of a reasonable person, are unaware that they have suffered legally cognizable harm." *Gaston*, 318 Or. at 256.

"Precisely when a person reasonably should have known that the harm suffered was caused by another's negligence generally presents a question of fact. Still, in some cases, the facts may be such that no triable issue exists as to when a plaintiff knew or should have known that the defendant caused the harm suffered, and, in those cases, the matter may be resolved as a matter of law." *Hoeck v. Schwabe, Williamson & Wyatt*, 149 Or. App. 607, 612 (1997) (citation omitted).

**B. Plaintiffs' 2011 Lawsuit in Texas**

Defendants argue, first, that Plaintiffs knew or should have known the facts upon which their Complaint is based at least by January 2011 when CKH and Maya sued the Company in Texas, represented by Shaw. At that time, CKH and Maya sued the Company for securities fraud, misrepresentation, and breach of fiduciary duty. Defendants argue that Plaintiffs therefore knew of their current claims—which are substantially similar—at least by the time they filed the Texas lawsuit. Defendants further argue that Plaintiffs failed to meet the requirements of Oregon's "saving statute," which would have given Plaintiffs 180 days to refile in Oregon court after the dismissal of the Texas lawsuit without running the statute of limitations. Instead, Defendants point out, Plaintiffs waited three years to sue Defendants in Oregon.

PAGE 9 – OPINION AND ORDER

Plaintiffs respond that the Texas lawsuit did not start the statute of limitations for the pending case, because Plaintiffs did not, at that time, know or have reason to know the facts that underlie their current claims. Plaintiffs characterize the Texas lawsuit as purely a "discovery lawsuit," which asserted fraud with no supporting allegations. As Plaintiffs explain, in 2011 this was sufficient to state a claim under Texas law. Plaintiffs' goal was to obtain documents through discovery in that lawsuit. Plaintiffs suspected that fraud had been committed, and hoped that those documents would reveal as much. As Plaintiffs point out, they did not receive those documents at that time, and could not have re-filed in Oregon under Oregon's more demanding pleading standard, because they did not yet have sufficient facts on which to state a claim. Oregon's saving statute, Plaintiffs therefore argue, is irrelevant, because the statute of limitation of their current fraud claim, *based on the Holt Homes loan*, had not yet begun to run.

In the Texas lawsuit, Plaintiffs asserted claims of intentional misrepresentation, fraud, breach of fiduciary duty, and conspiracy. Plaintiffs now allege misrepresentation, breach of fiduciary duty, and aiding and abetting an unlawful sale of securities. Plaintiffs also seek rescission on the grounds that Defendants sold Plaintiffs securities by means of an untrue statement of a material fact or an omission of material fact. Plaintiffs' pending causes of action, however, are substantially the same as those they brought in Texas in 2011, and arise out of the very same investment. The original complaint in the Texas lawsuit does not provide any specific facts on which Plaintiffs' claims were based. The second amended complaint (or petition) in Texas, however, does illuminate the underlying bases for Plaintiffs' claims in the Texas lawsuit. The second amended complaint alleges that the misrepresentations Kubicek made included, *but were not limited to*, representing that the venture would be highly successful, that it would be managed and operated by him in a professional and detail-oriented manner, and that the

Company's records would be timely, fully, and properly provided to the investors. Plaintiffs assert that their claims in the current lawsuit are based on different alleged misrepresentations. Specifically, Plaintiffs allege that Kubicek did not disclose the Holt Homes acquisition loan, and that this amounted to a nondisclosure of material fact and was contrary to the PPM.

Plaintiffs argue that the Court's statute of limitations analysis should focus on the specific *facts* that Plaintiffs knew or reasonably should have known, citing *Keller* for the proposition that a statutory period begins to run when "a plaintiff has a high degree of certainty about the facts that would support the elements of his or her claim identified in the statute of limitations." *Keller*, 197 Or. App. at 463. Defendants urge that the Court instead focus on the *Keller* court's further statement that "a plaintiff can be held to have discovered the pertinent elements of his or her claim if he or she had a reasonable opportunity to become aware of facts that would support them." *Keller*, 197 Or. App. at 463. Defendants argue that, by filing the Texas lawsuit, Shaw represented to the Texas court that Plaintiffs had a good faith basis to believe that their claim either had a basis in law and fact, or was warranted by a good faith argument for a change in existing law. *See* Tex. R. Civ. P. 13. Thus, Defendants argue, Plaintiffs had, at that time, sufficient facts upon which to base their current claims with respect to the investment.

Plaintiffs rely heavily on *Wood v. Baker*, 217 Or. 279 (1959), and *Mathies v. Hoeck*, 284 Or. 539 (1978). In *Wood*, the plaintiffs alleged that the defendants made seven false misrepresentations in connection with the sale of a cattle and hay ranch to the plaintiffs. The defendants moved to dismiss on statute of limitations grounds. The trial court found that the plaintiffs had discovered the falsity of three of the representations more than two years before filing their lawsuit, and removed those representations from the jury's consideration. The defendants argued that when a part of a fraud is discovered, the statute of limitations runs on the

whole fraud. Thus, the defendants argued, the plaintiffs' claims based on the other four misrepresentations were time-barred as well. On review, the Oregon Supreme Court held:

> [N]otice of one specification of fraud is not as a matter of law necessarily notice as to all, but whether it is notice or not must depend upon the facts and circumstances of each case. If there be notice of facts and circumstances in connection with the discovery of one specification of fraud which would put a man of ordinary prudence and intelligence upon inquiry as to the other items of fraud, then of course the defrauded person would be charged with such knowledge as a reasonably diligent inquiry would disclose.

*Wood*, 217 Or. at 138. The court concluded in the *Wood* case that "the trial court was correct in submitting at least some of the specifications of fraud to the jury."

In *Mathies*, the plaintiff hired the defendant to complete work on the plaintiff's house. The two signed an agreement that indicated, among other things, that the charge for painters and carpenters would be $12 per hour plus an additional 20 percent for labor, materials, and subcontractors. The defendant provided a cost statement estimating that the work would cost $8,654. The defendant ultimately billed the plaintiff for $29,466. The parties met to discuss the bill's accuracy. During this discussion, the defendant admitted that he had only paid subcontracting painters nine dollars per hour, rather than 12. The defendant credited the plaintiff for this difference in the cost, and also provided a discount off of the total bill.

The plaintiff later learned from newspaper articles and a discussion with the Multnomah County District Attorney's office that the defendant was accused of knowingly charging customers in excess of what he actually paid laborers, and of giving cost estimates that he knew or had reason to know would be far below the actual total cost. After learning this, the plaintiff sued the defendant for fraud. The plaintiff asserted two theories: first, that the defendant had purposely estimated the cost of the construction to be below what the defendant knew the actual

cost would be; and second, that defendant purposely misrepresented the cost of carpenters and laborers.

With respect to the plaintiff's first theory, the court in *Mathies* concluded that the statute of limitations had not begun to run when the plaintiff discovered that his bill was much higher than originally estimated, because this did not necessarily lead him to conclude that the defendant's estimate was *intentionally* low. With respect to the plaintiff's second theory, however, the court concluded that because the plaintiff knew that the defendant had over-billed for the cost of painters, "the evidence disclosed as a matter of law that the plaintiff, in the exercise of reasonable care, should have discovered in August, 1972, that the carpenters and laborers had not been paid $12 per hour as represented." *Id.* at 545. As the court explained, after the plaintiff learned that the defendant had over-billed for the painters, he "had sufficient notice to excite his attention" regarding the claim that the charges for carpenters and laborers had also been overstated. *Id.* (quotation omitted). Although the defendant argued that he did not discover this claim because the time cards for the carpenters and laborers did not show the amount paid, the court concluded that the plaintiff could have ascertained the amount paid from other sources, such as by asking the defendant or the carpenters. *Id*. Thus, this second theory of recovery was barred by the statute of limitations. Together, *Wood* and *Mathies* indicate that the running of the statute of limitations for one theory of fraud does not *necessarily* start the running of the statute for another. Rather, the court must examine the facts and circumstances of each case.

Plaintiffs also cite *Gaston v. Parsons*, 318 Or. 247 (1994), to argue that the Texas lawsuit was based on different *facts*, and that bringing a claim based on one set of facts does not trigger the statute of limitations for the same claim based on a different set of facts. In *Gaston*, the plaintiff underwent surgery and later lost functioning in his left arm, which his surgeon had not

warned of as a possible side effect. For some time, the plaintiff's surgeon assured the plaintiff that the loss of function in his arm was temporary and would resolve itself within two years. Plaintiff did not recover the use of his arm within two years, and sued. The plaintiff made two claims: first, the plaintiff alleged that the surgery was performed without his informed consent; second, the plaintiff alleged that the surgery was negligently performed. The defendants argued, and the Oregon Supreme Court agreed, that the plaintiff's informed consent claim was time-barred because he knew, shortly after the surgery, that he had lost the function of his arm and that he had not been warned of that risk. *Gaston*, 318 Or. at 258.

The defendants in *Gaston* further argued that because both claims asserted by the plaintiff stemmed from allegedly negligent conduct relating to a single surgery, and because the plaintiff suffered only one harm—loss of function in his arm—the plaintiff's two claims were in fact a single claim that accrued when the plaintiff first became aware of the loss of function in his arm. The court disagreed. *Id.* at 258-59. As the court explained, "[i]nformed consent claims typically require knowledge of different facts than do negligent surgery claims." *Id.* at 259. Further, the two claims are "legally distinct," each "aris[ing] from the violation by a defendant of different legal interests of a plaintiff." *Id.* The two torts even "have different standards of care that are defined by different statutes." *Id.* at 260. "[W]hen two different legally protected interests are at stake, awareness of a violation of one interest does not put a plaintiff on notice as a matter of law of the possible violation of other distinct legally protected interests." *Id.* The plaintiff's second claim, for negligent performance of the surgery, arose when he knew or should have known that the surgery was negligently performed and that he was harmed by such negligence—and this timeline was affected by his surgeon's reassurance that his arm would not be permanently damaged. In short, the court concluded, "[f]or the purpose of the statute of limitations, an

informed consent claim is not the same as a negligent surgery claim." *Id.* The court also recognized the principle that "[j]ust because one specification of negligence in a complaint is barred by the statute of limitations, it does not necessarily follow that a specification of negligence having a different factual or legal basis is barred." *Gaston*, 318 Or. at 260 (citing *Little v. Wimmer*, 303 Or. 580, 585 (1987), where the court held that "although three negligence claims arose out of a single automobile collision, claims based on negligent design and negligent construction of intersection were time-barred, but claim based on negligent maintenance was not").

Plaintiffs also rely on *Nudo v. McNeil*, 702 F. Supp. 825 (D. Or. 1988). In *Nudo*, the plaintiff invested money with the defendant, asking that the defendant purchase only low-risk stocks. The value of the plaintiff's account declined substantially, and in October 1985 the plaintiff sold all of the stocks. After liquidating his stocks, the plaintiff received financial statements showing a net loss. In February 1986, a friend suggested to the plaintiff that the defendant might have selected the stocks inappropriately. In June 1986, the plaintiff sued the defendant in state court, alleging securities fraud. Plaintiff later voluntarily dismissed that action. In December 1987, the plaintiff sued the defendant in federal court alleging that the defendant gave improper investment advice amounting to federal securities fraud.

*Nudo*, which was a federal securities action, applied Oregon's two-year statute of limitations to the claim, but applied federal law to determine when the statute began to run. *See Nudo*, 702 F. Supp. 825, 827 (D. Or. 1988) (citing *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1309 (9th Cir. 1982)). Under the federal standard, much like in Oregon, "the period commences 'when the plaintiff had actual knowledge of the fraud or knowledge sufficient to put a reasonable person on notice.'" *Nudo*, 702 F. Supp. at 827 (citing *Davis v. Birr, Wilson & Co., Inc.*, 839 F.2d

1369, 1370 (9th Cir. 1988)). The defendants argued, among other things, that the plaintiff's original state court complaint contained an admission that the plaintiff knew of the alleged fraud when he liquidated his account. The first lawsuit's complaint alleged that it was not until selling his stock "that plaintiff learned none of the stock was appropriate for an IRT account or for his investment objectives." *Id.* at 827. The defendants argued that the statute of limitations, therefore, began when the plaintiff liquidated his stock. The court concluded, however, that this statement did not establish notice as a matter of law, particularly in light of the plaintiff's deposition testimony stating that he did not know, at the time he liquidated his stocks, that the investments had been inappropriate. *Id.* at 827.

Contrary to Plaintiffs' assertion, *Nudo* does not serve as an example of a case where a court found that filing a prior lawsuit for the same claim had not started the statute of limitations. The plaintiff's first lawsuit in *Nudo* was filed less than two years before he filed his second lawsuit, and the question in that case was not whether the filing of the lawsuit itself started the statute of limitations. Rather, the question was whether some information included in the complaint provided evidence that the statute of limitations had begun to run at an earlier date. Nonetheless, *Nudo* supports Plaintiffs' general argument insofar as it applies a relatively high bar to finding that a statute of limitations has run.

In the pending case, Plaintiffs urge the Court to focus on the *specific facts* underlying their Texas lawsuit and their current lawsuit, which Plaintiffs argue are distinct. At a high level of generality, the two lawsuits are essentially the same—Plaintiffs in each case allege that Defendants fraudulently induced Plaintiffs to invest in the Company by misrepresenting or failing to disclose facts material to the investment. Nonetheless, the specific facts underlying each claim are different. The question, therefore, is whether, considering all of the

circumstances, Plaintiffs' knowledge, in 2011, that Defendants may have made *other* misrepresentations regarding the investment would have put a reasonable person on notice of the now-alleged misrepresentations. The Court concludes that reasonable jurors could come to different conclusions. Therefore, the Court cannot say as a matter of law that the filing of the 2011 lawsuit started the running of the statute of limitations on Plaintiffs' current claims.

C. The 2014 Ledger

Defendants have an alternate argument that Plaintiffs' two-year statute has run. Plaintiffs assert that their statute of limitations did not begin to run until June 2015, because until that time Kubicek had concealed the Holt Homes loan, or at least its true nature, from Plaintiffs. Plaintiffs argue that documents provided in June 2015 showed, for the first time, that in 2005 Holt Homes had loaned the Company $3.4 million to close the acquisition of MGD and CCP, and that the Company had paid back the loan within a few months. According to Plaintiffs, this is the gravamen of Plaintiffs' current claims, which is that the Holt Homes loan was responsible for more than a third of the land acquisition dollars, that the loan doubled the Company's acquisition debt load over what was presented in the PPM, and that Kubicek paid Holt Homes—his own company—back before paying any of the Company's outside creditors or equity investors, such as Plaintiffs. Plaintiffs argue that the acquisition loan violated the PPM. Plaintiffs also argue that these facts were not available to them until June 2015.

Plaintiffs assert that detailed financial statements provided in June 2015 showed for the first time that in 2005 Holt Homes had loaned the Company $3.4 million to close the Clackamas County deal, and that Kubicek had paid Holt Homes back a few months later. It is these facts, according to Plaintiffs, that first alerted them to their current claims. Plaintiffs point specifically to a summary of related-party transactions (ECF 17 at 188-200). That summary shows amounts paid to Holt Homes, and specifically identified those amounts as repaying or reimbursing Holt

Homes for a loan used to purchase MGD & CCP. Plaintiffs also note that Plaintiffs followed up that disclosure with a letter requesting further information on the Holt Homes loan, and that in response, in February 2016, Defendants referred to the Holt Homes loan as a bridge loan made to allow the property acquisition to close, before all investor funds were received.

Defendants, however, argue that Plaintiffs actually had a ledger nearly identical to this one by May 5, 2014 ("2014 ledger"). A few months after dismissal of the Texas lawsuit in 2013, Bigby requested financial documents from the Company. The Company produced documents on May 5, 2014, and those documents were received by Bigby's office the next day. ECF 29-3; ECF 26-6 at 1. Among those documents was a ledger showing the same information with resepct to Holt Homes as shown in the 2015 list of related-party transactions. *Compare* ECF 17 at 189-190 *with* ECF 29-3 at 18. That ledger shows the same seven payments made to Holt Homes, identified in the same way—and described as repayment or reimbursement for an amount used to purchase MGD & CCP. Plaintiffs' attorney, Leslie Johnson, wrote to Defendants nearly one year later, on April 22, 2015, stating that she had "spent some time with the material [the Company] assembled in the spring of 2014." ECF 14-8 at 2. In this email, Johnson requested further information from Defendants, including an accounting of transfers from the Company to Kubicek, Holt Homes, or any other affiliate of either. ECF 14-8 at 3.

Plaintiffs respond that the 2014 ledger did not disclose the wrongful *nature* of the Holt Homes loan, and that it was only when the full context of *why* the loan was made came to light that Plaintiffs were able to determine they had a claim. Plaintiffs argue that the 2014 ledger did not signal that the Holt Homes obligation was an acquisition loan, and that "critical information was missing in 2014 that would allow a reasonable person to understand the significance of what the person was looking at, much less compel a juror to find plaintiffs must have known."

Plaintiffs do not, however, persuasively explain what additional information was missing in 2014 that arrived later, in June 2015. Each ledger describes the payments made as a repayment or reimbursement of an amount to purchase MGD/CCP. Further, the fact that *some* details may have been missing does not mean that the statute of limitations had not begun to run.

Plaintiffs sued Defendants in 2011, alleging that they were fraudulently induced to enter into the investment. Between the 2011 lawsuit and the time Plaintiffs received the 2014 ledger, Plaintiffs remained suspicious about the investment. On March 28, 2014, shortly before receiving the 2014 ledger, Bigby, Plaintiffs' then-attorney, wrote to Defendants. Bigby explained that his clients sued the Company in Texas "because Mr. Kubicek was choosing to not be transparent in his management of the LLC." Bigby wrote: "At the present time, my clients have serious suspicion that they may be the victims of a scam."

At the point of receiving the 2014 ledger, after Plaintiffs already believed that they had been the victims of a scam, a reasonable person would have reviewed the 2014 ledger. To the extent that information was missing that might have helped piece together the full picture of the Holt Homes loan, a reasonable person would have requested that information at that time. In fact, that is just what Plaintiffs' attorney, Johnson, did in April 2015, nearly one full year after Plaintiffs received the documents that included the 2014 ledger.

Plaintiffs also argue that simultaneous information sent to the Plaintiffs with the 2014 ledger included a list of "acquisition loans," and the Holt Homes loan was not on that list. Therefore, Plaintiffs argue, it was reasonable for them to miss the fact that the actual invoice register contained evidence that the Holt Homes loan was an acquisition loan. The Court is unpersuaded by this argument in light of the fact that Plaintiffs had already sued Defendants for

fraud, remained suspicious that they had been duped by Defendants, and were represented by counsel.

Plaintiffs also suggest that the 2014 ledger was not sufficient to start the limitations period because the relevant lines were only a small portion of a larger invoice register that itself was "buried" among hundreds of other pages of information. Again, this is unpersuasive. Defendants provided the 2014 ledger to Plaintiffs' lawyer in a disclosure made at the Plaintiffs' request. Plaintiffs had, by this time, been asserting that they were, at the very least, suspicious of the investment since 2011, when they had sued the Company alleging that Kubicek made fraudulent statements to induce Plaintiffs to invest in the Company. The receipt of the 2014 ledger showing that the Company had repaid Holt Homes for a loan used to purchase MGD and CCP, while Plaintiffs were on alert for evidence of fraud sufficient in 2011 to prompt them to file a lawsuit, was enough to start the statute of limitations. A reasonable person in Plaintiffs' position would have promptly reviewed those documents and made further inquiry if necessary. As such, Plaintiffs lawsuit, which was filed on September 16, 2016, more than two years after receiving the 2014 ledger, is untimely. This is a classic situation of a plaintiff who sat on his rights, rather than take timely action.

## CONCLUSION

Defendants' motion for summary judgment (ECF 13) is GRANTED, and Plaintiffs' motion for summary judgment (ECF 16) is DENIED as moot.

**IT IS SO ORDERED**.

DATED this 29th day of January, 2018.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge